**TP LABORATORIES, INC., an Indiana Corporation, Appellant/Cross Appellee,**

v.

**PROFESSIONAL POSITIONERS, INC., a Wisconsin corporation, Professional Positioners, Inc., a Delaware corporation, Gerald W. Huge and Richard W. Allessee, Appellees/Cross Appellants.**

**Appeal Nos. 83–660, 83–680.**

United States Court of Appeals, Federal Circuit.

Jan. 4, 1984.

Lloyd L. Zickert, Chicago, Ill., argued for appellant/cross appellee. With him on the brief was Glenn W. Ohlson, Chicago, Ill.

Allan B. Wheeler, Milwaukee, Wis., argued for appellees/cross appellants.

Before MARKEY, Chief Judge, SKELTON, Senior Circuit Judge, and NIES, Circuit Judge.

NIES, Circuit Judge.

These appeals are from the October 27, 1982 judgment of the United States District Court for the Eastern District of Wisconsin (Warren, J.) dismissing a charge of infringement of a patent for an orthodontic appliance. Sitting without a jury, the court held U.S. Patent No. 3,178,820 ('820), owned by TP Laboratories, Inc. (TP), invalid under 35 U.S.C. § 102(b), on the ground that a public use occurred more than one year prior to the filing date of the application for the subject patent.

TP appeals the holding of invalidity. TP admits that the inventor used the dental appliance on three orthodontal patients during the critical period but asserts that such use was non-barring experimental use. On this issue we agree with appellant and reverse. However, since the issue of whether the accused devices are infringements, as well as other issues, were not decided, it is necessary to remand.

In the cross-appeal Professional Positioners et al. (PRO) appeal the denial of an award of attorney fees under 35 U.S.C. § 285, and seek an increase in the amount awarded under Rule 37(d) of the Fed.R. Civ.P. for costs attributable to TP's late production of certain documents during discovery. We affirm the district court's decisions on these matters.

Our jurisdiction is found in 28 U.S.C. § 1295(a)(1).

I

Appellant-plaintiff, TP Laboratories, Inc., makes and sells orthodontic supplies and appliances to the dental profession. TP Laboratories is a separate business from the professional practice of the Kesling and

Rocke Orthodontic Group (K & R), a group of four othodontists, Doctors Harold D. Kesling, Robert A. Rocke, Peter C. Kesling and David L. Kesling, but the firms are closely connected. The record before us shows that Dr. Harold Kesling, now deceased, (Kesling), who is the inventor named in the patent in suit, was an officer and one of the owners of TP Laboratories. Dr. Peter Kesling is president. The two businesses share a small building and employ the same office manager.

Kesling conceived and made the first prototype of the invention of the patent in suit in 1956. It was not, however, until February 19, 1962, that Kesling filed a patent application on his invention for which the '820 patent was granted on April 20, 1965. On November 1, 1965, the patent was assigned to TP Laboratories.

The subject matter of the '820 patent is a molded tooth positioning appliance which is to be worn several hours a day by a person undergoing orthodontic treatment. The general type of device is not new. The improvement by Kesling lies in placing wires in the device which fit in the embrasure area between the teeth and keep the appliance in position without the necessity of the patient exerting constant jaw pressure. The wires are referred to as "seating devices," "seating springs," "precision seating springs," "springs," or "metal adjuncts." Because of the shape, as seen below, the invention is also referred to as a tooth positioner with "C's":

This figure is a transverse sectional view illustrating one form of positioning means or clip employed for obtaining proper positioning of the dental appliance in a person's mouth.

The use of tooth positioners with C's in the treatment of three K & R patients during the period 1958–61 led to the issues under 35 U.S.C. § 102(b). It is undisputed that these three devices fell within the language of the '820 claims and no modification of design was made as a consequence of these uses. The evidence which established these uses was found in the patient records of K & R and the underlying facts are not in dispute. Appellant characterizes these uses as secret and/or experimental; appellees urge that they are, as found by the district court, public uses within the meaning of the statute.

The first use of the claimed invention on a patient occurred on August 25, 1958. Orthodontal treatment of this patient (Furst) spanned the time period between February 1958 and April 1964. Use of the device terminated after approximately two months. During discovery, the device itself was produced, having been retained by K & R in the patient's model box. This patient's manibular model from the model box was inscribed "experimental wires." Over the six year period of treatment, this patient was also fitted with other devices, retainers as well as positioners not embraced by the '820 claims.

Another patient (Rumely-Brady) who had begun treatment in August 1958 was supplied with a tooth positioner equipped with C's on November 10, 1959. Entry on the record card of this patient indicates "results fair" on December 18, 1959; "results better" on February 5, 1960, and "results good" on August 1, 1960. Nevertheless, use of the device was discontinued on January 16, 1961, in favor of retainers, because certain spacing irregularities were not being corrected. The same positioner with C's was again prescribed on May 5, 1961, and was used in conjunction with various other devices until at least March of 1962. The patient missed a later scheduled appointment which is the last entry on her card.

A positioner with C's was prescribed for a third patient (Spiers-Elliott) on November 1, 1960. Its use apparently was discontinued about three months later, a different

device being mailed to the patient on February 2, 1961. During the treatment of this patient, which spanned the period of time between January 21, 1960, and November 24, 1961, three different positioners were prescribed, only one of which was embraced by the '820 claims.

The initial use in each of the above cases occurred prior to the critical date of February 19, 1961. During the years 1958–60, K & R placed 606 tooth positioners, of which only the three described above were within the claims of '820. In 1961, after the critical date, 28 tooth positioners with C's were prescribed by K & R out of a total of 151.

The above devices were made for the K & R patients by TP, including C's handmade by Kesling. There is no evidence that K & R charged patients specifically for any positioner. With two of the three patients, K & R followed its regular practice of setting a fixed total fee for professional services, which included necessary appliances. One patient (Furst), whose father was a dentist, received free treatment as a professional courtesy.

Sales of the patented device to other orthodontists began in 1966, that is, only after TP's acquisition of the patent. Appellees, Huge and Allessee, had no knowledge of the invention even though employed at TP prior to 1961.

The district court did not rule on whether appellees' allegedly infringing devices came within the scope of the claims of the '820 patent and we know only that infringement is charged since 1972.

## II

### A

The patent statute provides in pertinent part in 35 U.S.C. § 102:

A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(b) the invention was ... in public use ... in this country, more than one year prior to the date of the application for patent in the United States.

Decisions under this provision and comparable provisions in earlier statutes are marked by confusion and inconsistency.[1]

"The general purpose behind all the [§ 102(b) ] bars is to require inventors to assert with due diligence their right to a patent through the prompt filing ... of a patent application." 2 D. Chisum, *Patents* § 601 (1981 & Supp.1983).

More specifically, courts have discerned a number of factors which must be weighed in applying the statutory bar of § 102(b).[2] Operating against the inventor are the policies of 1) protecting the public in its use of the invention where such use began prior to the filing of the application, 2) encouraging prompt disclosure of new and useful information, 3) discouraging attempts to extend the length of the period of protection by not allowing the inventor to reap the benefits for more than one year prior to the filing of the application. In contrast to these considerations, the public interest is also deemed to be served by allowing an inventor time to perfect his invention, by public testing, if desired, and prepare a patent application.

The district court's consideration of the issue of public use proceeded according to the following two-step analysis:

Consequently, the first step in analyzing PRO's 35 U.S.C. § 102(b) assertion is to determine whether a public use occurred.

---

1. *Compare Watson v. Allen,* 254 F.2d 342, 117 USPQ 68 (DC Cir.1958) with *In re Blaisdell,* 242 F.2d 779, 113 USPQ 289 (CCPA 1957); *See* G.T. Welch, *Patent Law's Ephemeral Experimental Use Doctrine,* 11 Tol.L.Rev. 865–92 (1980); Note, *The Public Use Bar to Patentability; Two New Approaches to the Experimental Use Exception,* 52 Minn.L.Rev. 851 (1968); Wells & Riggins, *Public Use and Sale as a Bar to Obtaining a Patent and Its Application to Government Activities,* 18 Am.U.L.Rev. 43, 51–

57 (1968); Pigott, *The Concepts of Public Use and Sale,* 49 J.Pat.Off.Soc'y 399, 411–26 (1967); Comment, *Experimentation and Public Use of Inventions—An Analysis of Appellate Anemia,* U.Ill.L.F. 585 (1960); Vassil, *Public Use; The Inventor's Dilemma,* 36 Geo.Wash.L.Rev. 297 (1958).

2. *See generally, In re Smith,* 714 F.2d 1127, 1135, 218 USPQ 976, 983 (Fed.Cir.1983).

If a public use is found, then the Court must ascertain whether the use was not a public use under the statute because it was experimental.

As to the first step, the district court reasoned:

The evidence in this case clearly establishes use by at least three patients more than one year prior to the application date. Furthermore, these users were "under no limitation, restriction or obligation of secrecy to the inventor." *Randolph v. Allis-Chalmers Manufacturing Co.,* 264 F.2d [533] at 535 [120 USPQ at 513]. Certainly there is no evidence to the contrary and there is testimony to support such a finding.... Consequently, the Court can only conclude that the patients were under no obligations of secrecy or for that matter any restrictions.

TP argues that these items were in secret because even the patients were not aware of the "testing." This is not significant. The plain fact is that the claimed invention was not kept secret. It was open to public observation without restriction which is sufficient to constitute "public use." *See Egbert v. Lippmann,* 104 U.S. 333 [26 L.Ed. 755] (1881). Furthermore, Dr. Furst was aware that the precision seating springs were a new device.... In addition, several of Mrs. Spiers Elliott's associates saw the device. Consequently, the feigned secrecy relied upon by TP accords it no aid in claiming that the "use" was not "public."

On the second issue as perceived by the district court, the court placed a heavy burden of proof on the patent owner to prove that the inventor's use had been experimental and expressly found that TP did not carry that "burden." In the words of the court:

The inventor bears a heavy burden of showing that the public use was bona fide experimentation.

＊　　＊　　＊　　＊　　＊　　＊

The experimental exception is unavailable to plaintiff TP for two reasons. First, the evidence presented does not establish that the patentee was conducting a bona fide experiment. On the contrary, the record shows that the uses were random and poorly monitored. The only records kept by Dr. H. Kesling were the patient records. Dr. H. Kesling, the inventor, did not always evaluate how well the precision seating springs worked when the patients visited the clinic. Other doctors often made evaluations of performance. Furthermore, while the issue of experimentation is in effect a matter of the inventor's intent, in the present case the evidence indicates that his intent was not experimentation. In experimenting on a prior "invention," Dr. H. Kesling kept accurate records of the results of his experiments. In the present case, the records are scanty at best.

It is important to note that the burden was on the plaintiff TP to show that use was a genuine experiment. Accurate records of the results of an experiment are certainly an indicia that the use was a bona fide experiment. In contrast the dearth of such records indicate that the use was not an experiment. The experimental use exception "is to be guarded closely." *Atlas Chemical Industries, Inc. v. Moraine Products,* [509 F.2d 1, 4] 184 U.S.P.Q. 281, 283 (6th Cir.1974). TP has simply failed to prove that the inventor, Dr. H. Kesling, was conducting a bona fide experiment.

Assuming, however, that the use was experimental, the delay in filing the patent application was unreasonable. The first use of the invention was in August of 1958. By April of 1959, Dr. H. Kesling knew that the precision seating springs operated as designated.... Nevertheless, Dr. H. Kesling waited until February 19, 1962 to file his patent application. Significantly, the claimed invention disclosed in figure 7 of the patent in suit is substantially the same as the precision seating spring disclosed in the positioner ... supplied to Nancy Furst in August of 1958.

＊　　＊　　＊　　＊　　＊　　＊

The delay here was unreasonable because the device proved satisfactory immediately. At least as early as 1960 Dr. Kesling learned that the invention was workable. At that point his time began to run under 35 U.S.C. § 102(b). Even if he had made minor improvements over the period, all this Court needs [sic] find is that the application was filed more than one year after the basic invention was disclosed within the meaning of section 102(b). *Franz [Frantz] Manufacturing Co. v. Phenix Manufacturing Co.,* 457 F.2d 314 [173 USPQ 266] (7th Cir.1972). This Court is of the opinion that when an experiment tolls section 102(b), the one-year period of limitations commences to run when the invention disclosed proves workable.

We disagree with this analysis and the shift in the burden of proof which led the district court to an erroneous result.

### B

It is not public knowledge of his invention that precludes the inventor from obtaining a patent for it, but a public use or sale of it.

The above quotation is from *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 136, 24 L.Ed. 1000 (1877), which is the starting place for analysis of any case involving experimental use. There, a toll road, built according to the invention of the patent in suit, was in daily use for a period of 6 years before the inventor filed for a patent. In upholding the validity of the patent, the Supreme Court spoke with clarity but through the years the guidelines set forth therein have been obfuscated. Returning to the original, we quote the following passages which are particularly pertinent to our analysis here:

That the use of the pavement in question was public in one sense cannot be disputed. But can it be said that the invention was in public use? The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a use. Curtis, Patents, sect. 381; *Shaw v. Cooper,* 7 Pet. 292 [8 L.Ed. 689].

Now, the nature of a street pavement is such that it cannot be experimented upon satisfactorily except on a highway, which is always public.

When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary. If durability is one of the qualities to be attained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiment; and no one would say that such a use, pursued with a *bona fide* intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent.

It would not be necessary, in such a case, that the machine should be put up and used only in the inventor's own shop or premises. He may have it put up and used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still, if used under the surveillance of the inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use, and

not a public use, within the meaning of the statute.

Whilst the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it. If it be a grist-mill, or a carding-machine, customers from the surrounding country may enjoy the use of it by having their grain made into flour, or their wool into rolls, and still it will not be in public use, within the meaning of the law.

But if the inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is, with his consent, put on sale for such use, then it will be in public use and on public sale, within the meaning of the law.

97 U.S. at 134–35.

■ In the decision on appeal, the trial court looked for proof of an exception to the public use bar. However, in *Elizabeth,* the Supreme Court did not refer to "experimental use" as an "exception" to the bar otherwise created by a public use. More precisely, the Court reasoned that, if a use is experimental, even though not secret, "public use" is negated. This difference between "exception" and "negation" is not merely semantic. Under the precedent of this court, the statutory presumption of validity provided in 35 U.S.C. § 282 places the burden of proof upon the party attacking the validity of the patent, and that burden of persuasion does not shift at any time to the patent owner. It is constant and remains throughout the suit on the challeng-

er. As stated in *Richdel, Inc. v. Sunspool Corp,* 714 F.2d 1573, 1579, 219 USPQ 8, 11–12 (Fed.Cir.1983):

> 35 USC 282 *permanently* places the burden of proving facts necessary to a conclusion of invalidity on the party asserting such invalidity. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 218 USPQ 871 (Fed.Cir.1983); *Solder Removal,* supra, 582 F.2d [628] at 633, 199 USPQ at 133.

■ Under this analysis, it is incorrect to impose on the patent owner, as the trial court in this case did, the burden of proving that a "public use" was "experimental." These are not two separable issues. It is incorrect to ask: "Was it public use?" and then, "Was it experimental?" Rather, the court is faced with a single issue: Was it public use under § 102(b)?

■ Thus, the court should have looked at all of the evidence put forth by both parties and should have decided whether the entirety of the evidence led to the conclusion that there had been "public use." This does not mean, of course, that the challenger has the burden of proving that the use is not experimental. Nor does it mean that the patent owner is relieved of explanation. It means that if a *prima facie* case is made of public use, the patent owner must be able to point to or must come forward with convincing evidence to counter that showing.[3] *See Strong v. General Electric Co.,* 434 F.2d 1042, 1044, 168 USPQ 8, 9 (5th Cir.1970). The length of the test period is merely a piece of evidence to add

---

**3.** We do not read *Smith & Griggs Mfg. Co. v. Sprague,* 123 U.S. 249, 267, 8 S.Ct. 122, 131, 31 L.Ed. 141 (1887) as contrary to this view, as urged by appellees. However, assuming that in *Smith & Griggs,* the Court intended to impose the ultimate burden of persuasion on the patent holder rather than merely the burden of going forward with countering evidence, we do not believe that view is tenable in the face of the subsequently enacted statutory presumption. As stated in *Austin Machinery Co. v. Buckeye Traction Ditcher Co.,* 13 F.2d 697, 700 (6th Cir.1926), where a similar argument was advanced with respect to the meaning of *Smith & Griggs*:

> The presumption of the validity of the patent is such that the defense of invention by

another must be established by the clearest proof—perhaps beyond reasonable doubt. The same rule apparently should apply to the defense of prior public use or sale by the inventor. When an actual sale in the critical period appears, it may well be that the trier of fact will mentally shift the burden of evidence necessary to show this sale to have been so modified that its existence did not make the device "on sale" within the meaning of the statute; but we see no reason why the legal burden of proof should shift, and we know of no authoritative and considered decision to that effect. It would seem that the legal and heavy burden of proof as to all the elements involved continues until the end upon one who attacks the patent grant.

to the evidentiary scale. The same is true with respect to whether payment is made for the device, whether a user agreed to use secretly, whether records were kept of progress, whether persons other than the inventor conducted the asserted experiments, how many tests were conducted, how long the testing period was in relationship to tests of other similar devices. In other words, a decision on whether there has been a "public use" can only be made upon consideration of the entire surrounding circumstances.

■ While various objective indicia may be considered in determining whether the use is experimental, the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value. *In re Smith*, 714 F.2d at 1127, 218 USPQ at 976.

### C

■ Applying the principles set forth above to this case, that non-secret uses of the device were made prior to the critical date is not in itself dispositive of the issue of whether activity barring a patent under 35 U.S.C. § 102(b) occurred. *Minnesota Mining & Manufacturing Co. v. Johnson & Johnson*, 179 USPQ 216, 220 (N.D.Ill.1973). The fact that the device was not hidden from view may make the use not secret but non-secret use is not *ipso facto* "public use" activity. *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. at 136. Nor, it must be added, is all secret use *ipso facto* not "public use" within the meaning of the statute, if the inventor is making commercial use of the invention under circumstances which preserve its secrecy.

■ Turning to the instant case, we note first that disclosure of the seating device to patients could not be avoided in any testing. In some circumstances, no doubt it would be significant that no pledge of confidentiality was obtained from the user. In the circumstances of use by orthodontal patients, we attach no importance to the fact that the doctor did not ask a patient to swear to secrecy. As in *City of Elizabeth*, testing of the device had to be public to some extent

and it is beyond reasonable probability that a patient would show the device to others who would understand the function of the C's or would want to duplicate the device. One is all that is needed and, if lost or broken, the patient would expect it to be replaced by the treating dentist.

In any event, a pledge of confidentiality is indicative of the inventor's continued control which here is established inherently by the dentist-patient relationship of the parties. Nothing in the inventor's use of the device on his patients (or the transfer to them) is inconsistent with experimentation. Similarly, the routine checking of patients by one of the other K & R orthodontists does not indicate the inventor's lack of control or abandonment to the public.

Secondly, the finding is clearly erroneous that the invention "proved satisfactory immediately," or "by April of 1959." In this connection, it is noted that the '820 patent itself describes a utility of the patented device for correcting orthodontal irregularities as "urging teeth into preselected positions." The patient records discussed above indicate that treatment to correct such orthodontal irregularities can range from two to six years. Moreover, while results appeared to be good within six months use by one patient, the variable of patient cooperation cannot be checked by one patient alone. Use on three patients is not an obviously excessive number. In other words, the test for success of the improvement was not whether it could be used at all, but whether it could be said to work better on patients than a positioner without C's. Again, as in *City of Elizabeth*, the test of necessity had to run for a considerable time and on several patients before the inventor could know whether "it was what he claimed it to be" and would "answer the purpose intended."

A factor in favor of the patentee is that during this critical time the inventor had readily available all of the facilities of TP to commercially exploit the device. Yet, no positioners with C's were offered competing orthodontists despite the fact this was one facet of the inventor's total business activi-

ty. Further, the inventor made no extra charge for fitting the three patients with the improved positioners although that in itself is not critical. The facts here indicate the inventor was testing the device, not the market. No commercial exploitation having been made to even a small degree prior to filing the patent application, the underlying policy of prohibiting an extension of the term is clearly not offended in this respect.

Indeed, none of the policies which underlie the public use bar and which, in effect, define it have been shown to be violated. At most, the record shows that the uses were not secret, but when the evidence as to the facts of use by the inventor is considered as a whole, we conclude that appellees failed to prove that the inventor made a public use of the subject invention within the meaning of 35 U.S.C. § 102(b). The patent may not be held invalid on this ground.

### III

*Fees Under Rule 37(d) of the Fed.R.Civ.P.*

■ No error or abuse of discretion is found in the award of fees to appellees under Rule 37(d) or in the amount of the award. Appellant's premise that no order of the court was violated by its failing to produce certain invoices ignores the scope of the December 31, 1975 order. In PRO's motion leading to that order "All invoices ... to Kesling-Rocke Orthodontic Center" were specifically designated and thus, the withheld invoices fall under its terms.

### IV

PRO's cross-appeal from the district court's denial of attorney fees under 35 U.S.C. § 285 is dismissed as moot. In view of our disposition of the appeal, PRO is no longer a prevailing party to whom an award could be made. *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1564, 219 USPQ 377, 386 (Fed.Cir.1983).

### *Summary*

The decision of the district court holding U.S. Patent No. 3,178,820 invalid is *reversed.* The decision of the court awarding costs and fees under Rule 37(d) is *affirmed.* The cross-appeal is *dismissed.* The case is *remanded* to the district court for proceedings consistent herewith.

REVERSED–IN–PART; AFFIRMED–IN–PART; REMANDED CROSS–APPEAL; DISMISSED.