**J–STAR INDUSTRIES, INC., and Ronald F. Dubbe, Plaintiffs and Counterdefendants,**

v.

**John OAKLEY d/b/a Big Oak Farm Equipment, Defendant and Counterplaintiff.**

No. L88–298–CA5.

United States District Court, W.D. Michigan, S.D.

Aug. 25, 1989.

Price, Heneveld, Cooper, DeWitt & Litton, Grand Rapids, Mich., Wood Dalton Phillips Mason and Rowe, Chicago, Ill. by William A. VanSanten and J. Roy Wood, for plaintiffs.

Howard & Howard, Kalamazoo, Mich., Rockey & Rifkin, Chicago, Ill. by Thomas C. Elliott and Kathleen A. Lyons, for defendant.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on Plaintiffs' J–Star Industries ("J–Star") and Ronald Dubbe's Motion for Preliminary Injunction. The Court held a hearing in this matter on August 15, 1989, during which the parties' counsel answered specific questions posed to them by the Court. After carefully considering the parties' well-prepared briefs and exhibits, and their answers to my questions, I have concluded that plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits of their infringement claim. Accordingly, plaintiff's motion for preliminary injunction is denied.

## FACTS

This is a patent infringement action involving automatic feeding systems for dairy cattle. Plaintiffs are J–Star Industries, a manufacturer of farming equipment, and Ronald Dubbe, the inventor of plaintiffs' product, the "Grain Brain Feeding System," U.S. Patent No. 4,770,124 ("the '124 patent"). The defendant, John Oakley, now markets an automatic feeding system for dairy cattle called the "Multi–Choice Feeding System." Plaintiffs claim that Oakley's product infringes claim 11 of the '124 patent under the doctrine of equivalents. Mr. Oakley argues that the patent is invalid under 35 U.S.C. § 102(b), because plaintiff sold it to the public more than one year prior to filing their patent application. Defendant also denies infringement.

Sometime before January, 1987, Mr. Dubbe developed the feeding system which is the subject of the '124 patent. He filed the patent application on January 12, 1987.

Plaintiff's Ex. C. The patent issued on September 13, 1988. *Id.* Mr. Dubbe originally licensed the product to Starline Products, Inc. Plaintiff's Ex. A at ¶ 5 (Johnson Affidavit). While the patent application was pending, Starline formed plaintiff J–Star Industries, Inc. *Id.* at ¶ 2. The defendant was formerly a marketing representative for Starline. He indicates that he attended a meeting on October 19–21, 1986 where Starline introduced the "Grain Brain" system to its salesmen. Defendant's Exhibit D at ¶ 2 (Oakley Affidavit). Oakley was not retained as an employee when Starlines changed to J–Star. Plaintiffs allege that Mr. Oakley began marketing his own feeding system, the "Multi–Choice Feeding System," in August, 1987.

Mr. Oakley contends that he began to develop his feeding system in April, 1986. Throughout April and May, 1987, Mr. Oakley contacted a number of companies to secure parts for his prototype system. He first displayed the system at an agricultural exposition at Michigan State University on July 21–23, 1987. Developmental efforts continued until December, 1987. The first Multi–Choice Feeding System was installed on a customer's farm in February, 1988. This system featured a grid covering its upper opening. Mr. Oakley contends that he manufactured and sold his original system until September, 1988, when he learned that Dubbe had secured a patent on the Grain Brain. Only one Multi–Choice system was sold before September 23, 1988 (the day Oakley learned of the patent) and one system embodying Oakley's original design was delivered after that date. Mr. Oakley has since revised his feeding system. He contends that the new system does not infringe the '124 patent primarily because it has no grid covering the top opening.

Plaintiffs allege that the accused product, the Multi–Choice Feeding System, infringes claim 11 of the '124 patent. Although plaintiffs originally did not assert infringement under the doctrine of equivalents, they now make the claim that Oakley's product is designed to perform substantially the same function in substantial-

ly the same way to obtain the same result as the patented invention. Claim 11 of the '124 patent reads as follows:

11. An inexpensive cattle feeding system, comprising:

a feed container having an enlarged open top to facilitate loading of feed by a dairyman, a lower, reduced size dispensing opening, and a vertically movable, at least partially ball-like valve for selectively opening said dispensing opening;

a grid secured to said container and extending across said enlarged open top to allow loading therethrough while preventing cattle from obtaining access to feed in the container;

a cable extending vertically through said grid into the container and affixed to the valve therein so that movement of said cable will open said valve or allow it to close;

a shield for said cable including a vertical tubular sleeve through which the cable extends, said sleeve having a lower end extending through said grid and into said container and being adapted to prevent cattle from tripping the associated cable to prematurely release feed from said container; and

means securing said lower end to said grid to prevent relative movement therebetween so that cattle cannot jostle said tubular sleeve;

whereby said container may be manually and easily loaded through said enlarged open top and said grid while said valve cannot be prematurely opened by cattle.

Plaintiffs contend that Oakley's product has the following elements which are also all the elements of claim 11 of the '124 patent:

1. A feed container with an enlarged open top, a lower reduced size dispersing opening, and a ball-like valve.

2. A grid secured to the container and extending across the enlarged open top.

3. A cable extending vertically through the grid, into the container and affixed to the valve.

4. A shield for the cable including a vertical tubular sleeve through which the cable extends.

5. Means securing the lower end of the container to the grid, so that there is no relative movement between the two. *See* Plaintiff's Exhibit A ¶ 9.

The defendant argues that his product cannot be said to infringe the '124 patent because it does not have a grid covering the enlarged open top, an essential element of claim 11. Although the defendant admittedly sold feeding systems featuring a grid over the enlarged open top, the system he currently offers for sale uses a funnel-shaped container to send the feed into the dispensing end of the system. One of his revised systems, shown in defendant's Exhibit 6, has a single side-to-side member mounted at the extreme periphery of the dispenser top to allow passage of the cable attached to the ball valve through the funnel. Another revised system shown in defendant's Exhibit 6, which is apparently the current version of the system, has no side-to-side member at all. In this system, the cable attached to the ball valve is encased in a metal sleeve and passes through a hole in the funnel-shaped upper container to the lower, dispensing container.

## STANDARD

■ The standard for preliminary injunctive relief in patent cases differs somewhat from the standard applied in other areas of the law. The Federal Circuit summarized the applicable inquiries as follows:

(1) Whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(4) whether the granting of a preliminary injunction will disserve the public interest.

*Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269 (Fed.Cir.1985); *Litton Systems Inc. v. Sundstrand Corp.,* 750 F.2d 952 (Fed.Cir.1984); *Stein Associates Inc. v. Heat Control Inc.,* 748 F.2d 653 (Fed.Cir. 1984). An injunction is appropriate where the patentee "clearly shows that his patent is valid and infringed...." *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985). *See also Smith International Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1578 (Fed.Cir.1983) ("it has been stated as a general proposition that the movant must show that the patent is beyond question valid and infringed"). Where validity and infringement have been clearly established, immediate irreparable harm is presumed. *Roper,* 757 F.2d at 1271; *Smith International,* 718 F.2d at 1581. As the court noted in *Roper,* however, the presumption of irreparable injury is not dispositive of whether an injunction should issue.

> The presumption does not change the ultimate equitable showing needed to justify a preliminary injunction. Like most legal presumptions, it is rebuttable by clear evidence that it is overcome in the case at hand. The presumption merely requires that an alleged infringer confronted by a patentee's strong showing of validity and infringement bring forward evidence that irreparable injury would not actually be suffered by the patentee if the motion for preliminary injunction were denied. The presumption rests on a strong showing that a valid patent is being infringed. When that is true, irreparable injury may be presumed. When, as here, infringement is neither actually occurring nor is it reasonably likely, the basis and need for the presumption crumbles.

*Roper,* 757 F.2d at 1272.

*Likelihood of Success–Validity and Infringement*

■ a. *Validity.* A patent is presumed to be valid, and the burden of proving that it is not is on the party asserting invalidity. 35 U.S.C. § 282. As the court noted in Roper, "A patent is born valid. It remains valid until a challenger proves it

was stillborn or had birth defects, or it is no longer viable as an enforceable right." *Id.* at 1270. The party asserting invalidity, here Oakley, must establish invalidity by clear and convincing evidence in order to prevail. *Alco Standard Corp. v. Tennessee Valley Authority,* 808 F.2d 1490, 1498 (Fed.Cir.1986); *American Hoist & Derrick Co. v. Sowa & Sons Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.1984). The presumption of validity does not have independent evidentiary value. *SSIH Equipment S.A. v. United States International Trade Commission,* 718 F.2d 365, 375 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983). Rather, "it requires the decisionmaker to employ a decisional approach that starts with acceptance of the patent claims as valid and that looks to the challenger for proof to the contrary." *Stratoflex,* 713 F.2d at 1534. The challenger has the burden of proceeding first on the question of validity, and of persuading the court that the patent is invalid. *Id.; SSIH Equipment,* 718 F.2d at 375 ("the presumption places the burden of going forward as well as the burden of persuasion upon the party asserting invalidity").

Here, Oakley argues that the '124 patent is invalid because the invention was on sale or in public use more than one year prior to the filing of the patent application. 35 U.S.C. § 102(b) provides that:

> A person shall be entitled to a patent unless—
>
> .    .    .    .    .
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

In support of his public use argument, Oakley relies upon a promotional videotape prepared by J–Star describing its "Grain Brain" system and upon the inventor's deposition testimony. The videotape, which is dated May 21, 1987, features an interview with Dennis Schrupp, who indicates that he has used the patented invention at his farm for "about a year and a half." Plaintiffs

admit that the patented invention was installed at the Schrupp farm on December 26, 1985. Dubbe filed his application for the '124 patent on January 12, 1987.

Another version of the patented invention was installed at the inventor's dairy farm, around the same time. Finally, a version was installed at the Siegle farm on January 20, 1986. This latter installation is after the critical date of January 12, 1986, and is thus irrelevant to determining whether there was a public use under section 102(b).

Dr. Dubbe indicated in his deposition that the version of the system installed at the Schrupp farm did not work well, because the top opening was too small and the feed got stuck. After noticing this problem, he "simply cut the existing neck and dispensing portion of the molds off, and put on a larger diameter unit, with the same basically, the basic design, except the size of the diameter." Dubbe Dep. at 61. A subsequent affidavit by Dr. Dubbe indicates that no attempts were made to sell the invention until March, 1986.

■■■ The Federal Circuit explained the limits of the "public use" rule in *In re Smith*, 714 F.2d 1127, 1134–35 (Fed.Cir. 1983) (citation omitted):

> "Public use" of a claimed invention under section 102(b) has been defined as any use of that invention by a person other than the inventor who is under no obligation of secrecy to the inventor. Such use however, has been held not to be a statutory bar to patentability if the use was primarily for bona fide experimental purposes.... The experiment to improve and perfect the invention must be the real purpose in such public use and not merely incidental and subsidiary. The experimental use exception,[1] however, does not include market testing where the inventor is attempting to gauge consumer demand for his claimed

invention. The purpose of such activities is commercial exploitation and not experimentation.

> Where, as here, the inventor made the allegedly public use he has the burden of going forward with convincing evidence that the public use activities fall within the experimental use exception.

> ... In determining the purpose of the alleged experimental use, objective evidence indicating a purpose for such testing and experiment is generally preferred. An inventor's subjective intent is generally of minimal value.

The party asserting that a public use has occurred has the burden to prove that use by clear and convincing evidence. *Moleculon Research Corp. v. CBS Inc.*, 793 F.2d 1261, 1266 (Fed.Cir.1986). Once the challenging party makes a prima facie case of public use, however, the patentee has the burden to come forward with convincing evidence that the use was not, in fact, public. *TP Industries Inc. v. Professional Positioners Inc.*, 724 F.2d 965, 971 (Fed. Cir.1984). A number of factors must be considered in determining whether a use is public for purposes of invalidating a patent:

> Factors to be considered in deciding whether there is a public use include, for example, the length of the test period, whether any payment has been made on the part of the user, whether progress records were kept, whether persons other than the inventor conducted the asserted experiments, how many tests were conducted and how long the testing period was in relationship to tests of similar devices.

*Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1535 (Fed.Cir.1984). *See also In re Smith*, 714 F.2d at 1135 (factors include "whether the inventor inspected the invention regularly ... whether the inventor retained control over the invention ... and

---

**1.** It is probably incorrect to refer to the experimental use situation as an "exception" to section 102(b). In *TP Laboratories Inc. v. Professional Positioners Inc.*, 724 F.2d 965 (Fed.Cir.1984), the court took pains to explain that experimental use *negates* a public use. It is not an exception to that rule, it simply is not within the public

use rule. *Id.* at 971. Thus, the party claiming invalidity still has the burden of proof on the public use issue. "[I]f a prima facie case is made of public use, the patent owner must be able to point to or come forward with convincing evidence to counter that showing." *Id.*

whether the commercial exploitation was merely incidental to the primary purpose of experimentation").

In *Smith*, the product at issue was a carpet deodorizer. The manufacturer conducted consumer tests, using 76 consumers, more than one year before it applied for a patent. No limitations were placed on the consumers' use of the product nor were they under any obligation to keep the test a secret. After a test period of two weeks, the manufacturer interviewed all but three of the consumers. Their comments related to the fragrance an ease of vacuuming up the product. No major design changes were made after the test.

The Federal Circuit found this to be a public use. A number of factors contributed to this conclusion. First, the technical data obtained from consumers could have been obtained by testing the product in the manufacturer's lab. No controls were placed on consumers' use of the product, rendering the "tests" of minimal scientific value. In addition, the court found that the dominant purposes of the test were "to determine whether potential consumers would buy the product and how much they would pay for it—commercial exploitation." *Id.* at 1135. The court further found that the tests related to unclaimed elements of the invention—fragrance and vacuumability. Since experimentation applies only to claimed features of an invention, these tests did not qualify as an experiment.

The court reached the same result in *Kinzenbaw v. Deere & Co.*, 741 F.2d 383 (Fed.Cir.1984). In that case, a manufacturer held four patents covering various aspects of a farm implement. Because the manufacturer wished to test the durability, warrantability, and acceptability of the implement, it made the machines available to distributors in eleven states over a two year period. The distributors allowed farmers to use the machines on their farms. By the end of the second season, the machines had been used for 1500 hours and had planted 40,000 acres. The court found this to be a public use:

In using the machines to test them for Deere, the farmers served Deere's commercial purposes. Deere has disavowed any claim that such use was experimental. Deere used the farmers as its agents, and the testing of the machines was a commercial use by Deere of its patented invention.

*Id.* at 391.

*Moleculon Research Corp. v. CBS Inc.*, 793 F.2d 1261 (Fed.Cir.1986) involved the popular puzzle known as the Rubik's Cube. The puzzle was developed in the late 1950's by a graduate student in chemistry. He made a prototype of the puzzle out of paper, showed it to his close friends and explained how it worked to at least one colleague. In 1968, he built a wooden prototype, which he usually kept at home. He brought it to work one day and his boss suggested that he attempt to market it as a toy. The inventor assigned his rights in the puzzle to his employer in 1969. The employer filed for a patent in 1970, which was issued in 1972. The Federal Circuit found no public use under these circumstances, primarily because it found no effort to commercialize the product before the application date. Although the inventor had shown the toy to many friends, he had always maintained control over it. His conversations with his employer were insufficient to constitute a public use since they concerned whether to pursue refining the toy, rather than how to market it. Finally, the court noted that the employer had made a single telephone call to a toy company before the application date, to determine whether the company would be interested in a new puzzle idea. Since no details concerning the nature or workings of the invention were discussed during this short phone call, the court found that it did not amount to a public use.

The question of public use in this case is a close one, and one that we need not finally resolve at this time. J–Star need only establish that it has a reasonable likelihood of succeeding on the merits of its infringement claim. There is a presumption that the patent is valid. Oakley must provide clear and convincing evidence of invalidity in order to succeed.

In this case, we have at least one use that occurred more than one year before the patent application—the installation at the Schrupp farm. The installation at the Siegle farm occurred after the critical date and the installation at the Dubbe farm seems to me to be more analogous to use by the inventor, since it is his farm, than to a public use. Plaintiffs admitted at the hearing that Mr. Schrupp paid for his Grain Brain system after it was installed and modified to include larger openings. Plaintiffs further admitted that Mr. Schrupp was not bound by a written confidentiality agreement while using the invention. He was told to use his own cattle feed and was not required to follow any particular procedure in using the invention. There is no indication that either Mr. Schrupp or the inventor prepared systematic reports on the invention's operation. The system was installed at Schrupp's farm on December 26, 1985, one year and seventeen (17) days prior to the date the patent application was filed. Dr. Dubbe indicated in his deposition that only minor changes were made in the system after its installation and that these changes were relatively obvious ones.

A number of factors indicate that the Schrupp farm was more commercial in nature than it was experimental. First, the information the inventor received from Mr. Schrupp could have been obtained by testing the invention with bulky feed at Dubbe's own farm. Second, with the exception of the clogging problem, Mr. Schrupp's insights about the system, as described in the promotional video tape, focus on unclaimed aspects of the invention: its ability to make the cattle eat more with fewer digestive diseases, enabling the cattle to produce more milk with a higher butter fat content. These are commercial aspects of the invention. They do not relate to how one builds the system, but rather to its advantages in use over regular hand feeding. It seems that J–Star allowed Mr. Schrupp to use the system in order to determine whether its claimed advantages over hand feeding would, in fact, materialize. This use thus seems more analogous to those at issue in *Smith* and *Kinzenbaw* than to the use in *Moleculon.*

On the other hand, we have only one such use. The invention does not appear to have been widely disseminated to the public. The inventor did gain at least one valuable piece of information about his invention from the Schrupp use—that bulky feed would clog the system, necessitating the use of wider openings. Finally, my impressions about the commercial nature of the test are based primarily on viewing the promotional video tape J–Star produced to market the system to dairy farmers. The purpose of the tape is to show farmers why the system will increase their production and make their cows healthier. It is not a tape designed to sell the system to potential manufacturers, so naturally it does not dwell on the technical aspects of the system, but rather on its practical advantages.

Weighing all this evidence, I find that Oakley has established, by clear and convincing evidence, the existence of serious questions regarding the validity of the '124 patent. This, in turn, undermines the likelihood that plaintiffs will succeed on the merits of their infringement claim. Mr. Schrupp used the system for more than a year before the application was made. His use was not subject to a written confidentiality agreement. There is no indication that the inventor controlled Mr. Schrupp's use of the system in any meaningful fashion. Any technical information gathered from the Schrupp use could have just as easily been gathered by experiments with the inventor's own cattle. Finally, the information the inventor received from Schrupp is more commercial than technical in nature. It relates to the system's efficacy in increasing milk production and decreasing disease among dairy cattle. This is information useful only in the marketing or commercialization of the product, rather than in the perfecting of the invention.

b. *Literal Infringement.* 35 U.S.C. § 271(a) provides that "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." Noninfringement may be asserted as a defense. 35

U.S.C. § 282(1). The patent owner bears the burden of proving infringement by a preponderance of the evidence. *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1123 (Fed.Cir.1985). The patent owner must show that the alleged infringer has "made, used or sold" a device coming within the scope of the patent claims in suit. *Fromson v. Advance Offset Plate Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983). "The infringement inquiry is broken down into two steps: first, the scope of the claims must be ascertained and then the trier must decide whether the claims cover the accused device." *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). The first is a question of law; the second a question of fact. *Fromson*, 720 F.2d at 1569.

■■■■ Infringement is determined by comparing the claimed invention against the accused product. It is not determined by comparing the patentee's and accused's commercial products, or by comparing the accused product to the patent's specifications. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). The claims of a patent measure the invention. Limitations contained in the specifications or in an independent claim may not be read to limit the reach of another claim. *Palumbo*, 762 F.2d at 977; *Environmental Designs v. Union Oil of California*, 713 F.2d 693, 699 (Fed.Cir.1983). Where a patentee claims literal infringement, he must establish that "every limitation of the patent claim [is] found in the accused device." *Uniroyal Inc. v. Rudkin–Wiley Corp.*, 5 USPQ 2d 1434, 1441, 837 F.2d 1044 (Fed.Cir.1988). *See also Texas Instruments v. United States International Trade Commission*, 805 F.2d 1558, 1562 (Fed.Cir.1986) ("Literal infringement requires that the accused device embody every element of the claim as properly interpreted"); *Stewart–Warner Corp. v. City of Pontiac*, 767 F.2d 1563, 1571 (Fed.Cir.1985); *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985).

In this case, the claim at issue, claim 11, requires "a grid secured to [a feed contain-er] and extending across [the container's] enlarged open top to allow loading therethrough while preventing cattle from obtaining access to the feed in the container...." Plaintiff's Exhibit C, col. 8, lines 37–40. In the "Summary of the Invention" section, the inventor describes this grid as "a plurality of elongate bolts extending across the top of the container in a grid pattern." *Id.* col. 2, lines 33–35. Dependent claim 15 defines the grid as comprising "first spaced elements spanning said open top in one direction and second spaced elements spanning said open top in another direction." *Id.* col. 9, lines 5–9. While these limitations may not be read to limit the scope of claim 11, the specifications and dependent claims may be used to explain what the inventor meant by his use of a particular term. *Fromson*, 720 F.2d at 1569 (claims "must be construed 'in connection with the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application' ").

■■■■ As can readily be seen by comparing the photographs of the two systems, the most recent versions of accused device in fact lack anything that could be called a "grid" extending across the top container. While the patented device is shown as having what is commonly referred to as a grid—a series of bars crossing over each other—the accused device is either completely unobstructed at the top, or has a single bar-like structure cutting across the extreme rear periphery of the upper container. The version of the Multi–Choice Feeding System currently on the market clearly lacks an essential element of the claimed invention. It does not literally infringe the '124 patent.

Just as clearly, however, the original version of Oakley's system had such a grid extending across the top of the upper container, as the photographs attached to plaintiffs' Exhibit B demonstrate. The product depicted in those photographs would, it appears, literally infringe the '124 patent. However, Mr. Oakley avers that this invention is no longer on the market. That averment is uncontradicted by J–Star, although J–Star maintains that Oakley

could introduce this version to the market at any time.

I find, therefore, that plaintiffs have failed to establish a reasonable likelihood of demonstrating literal infringement by the accused product which is currently on the market. Plaintiffs have, however, demonstrated a reasonable likelihood of success on their claim that Oakley's original product, the product shown in plaintiff's Exhibit B, literally infringes the '124 patent. That product, however, is no longer used or sold to the public.

■■■ c. *Infringement by Equivalence.* Where there is no literal infringement, the court may consider whether to apply the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607–08, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950). Equivalence is not established simply by showing accomplishment of the same result, because results are abstractions which cannot be patented. *Texas Instruments Inc. v. U.S. Int'l Trade Comm'n.*, 805 F.2d 1558 (Fed. Cir.1986). Rather, the proponent of infringement under this doctrine must show that the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. As the court explained in *Texas Instruments:*

> The determination of equivalency by its nature is inimical to the basic precept of patent law that the claims are the measure of the grant. The doctrine of equivalents, ubiquitous since its origin … exists *solely* for the *equitable* purpose of "preventing an infringer from stealing the benefit of the invention." *Graver Tank*, 339 U.S. at 608 [70 S.Ct. at 856]. To achieve this purpose, equivalency is judicially determined by reviewing the content of the patent, the prior art, and the accused device, and essentially redefining the scope of the claims. This constitutes a deviation from the need of the public to know the precise legal limits of patent protection without recourse to judicial ruling. For the occasional pioneering invention, devoid of significant prior art … whose boundaries probe the poli-

cy behind the law, there are no immutable rules. We caution that the incentive to innovation that flows from "inventing around" an adversely held patent must be preserved. To the extent that the doctrine of equivalents represents an *exception* to the requirement that the claims define the metes and bounds of the patent protection, we harken to the wisdom of the Court in *Graver Tank*, that the purpose of the rule is "to temper unsparing logic" and thus to serve the greater interest of justice.

*Id.* at 1572.

■■■ In this case, the plaintiffs argue that Oakley's two newer systems infringe the '124 patent because each system incorporates a device extending across the top opening of the feed container to prevent cattle from reaching the feed inside the dispenser while allowing for the loading of additional feed. Claim 11 specifies that the grid is: (a) secured to the container and extends across the container's enlarged top opening; (b) allows loading of feed while preventing access to it by the cattle; and (c) is attached to the cable shield to prevent movement of the shield. According to plaintiffs, the funnel on Oakley's latest system and the single side-to-side bar on its predecessor perform each of these functions and, therefore, infringe the '124 under the doctrine of equivalents.

The defendant contends that his product does not infringe under the doctrine of equivalents because his funnel-shaped container does not perform the same function as the claimed grid in that the funnel-shaped container will not prevent straw or other foreign matter from entering the dispensing container. Defendant further contends that the accused device performs functions the patented device cannot perform. The funnel-shaped container allows the accused device to store feed for more than one meal at a time. Feed may be loaded into the dispensing container, and the funnel-shaped container at the same time. The system can be operated so that the feed in the dispensing container is dispensed at one meal, while the feed in the upper, funnel-shaped container flows to the dispensing container to be dispensed at the

next meal. The funnel-shaped container thus performs at least one function that the claimed grid cannot perform.

I find this latter argument persuasive. The fact that the funnel-shaped container allows the system to store feed for more than one meal at a time indicates that the funnel-shaped container is more than a mere cosmetic change over the patented device. It allows the accused device to perform at least one function the patented device cannot perform. Thus, while the accused device performs some of the same functions as the claimed invention, it performs those functions in a substantially different way, thereby avoiding infringement under the doctrine of equivalents. *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1117 (Fed.Cir.1985).

The defendant also contends that claim 11 should be granted a narrow range of equivalents because the grid limitation contained in that claim was added to the claim during the prosecution of this patent to distinguish the claimed invention over the prior art. Defendant contends that the term "grid" must be limited to devices containing more than one bolt or other device extending across the top of the dispensing container, since this is the definition submitted to, and eventually accepted by the patent examiner. Plaintiff argues that claim 11's grid element may not be so limited because this would deprive dependent claim 15, which defines the term grid, of any independent meaning. Plaintiff contends that the term grid must be construed to mean any object that divides a large surface area into smaller sections. Under this definition, of course, a single bolt extending across the top of the dispensing container would qualify as a grid, as would the presence of a funnel extending into the opening.

Plaintiff explained the prosecution history of the '124 patent at the hearing, in response to questions posed by the Court. It appears that the inventor originally presented eighteen (18) claims in his patent application. The original application claims contained no mention of a grid, although the specifications referred to it. Fifteen (15) of the application claims were rejected by the patent examiner. The inventor responded by amending these claims, adding claim 11 and the structural limitation of a grid, in order to distinguish the invention over the prior art. The amendment notes that the inclusion of a grid distinguishes the invention over the prior art, since none of the prior art inventions included "a grid for the top opening that allows such easy manual feeding while preventing the cattle from achieving access to the interior of the system and neither [prior art reference at issue] provides a means where a cable shield is secured to the grid and extends into the container therein." First Amendment at 10. The inventor further noted that patent claim 15 (application claim 23) "specifies in greater detail the nature of the applicant's grid. It requires the grid to comprise first spaced elements spanning the open top of the container in one direction and second spaced elements spanning the open top in another direction." *Id.* at 11. The patent examiner eventually approved claims 11 and 15 as amended.

The doctrine of file wrapper or prosecution history estoppel "prevents a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of his patent application." *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983). *See also Tandon Corp. v. United States International Trade Comm'n.*, 831 F.2d 1017, 1021 (Fed.Cir.1987) ("Claims may not be construed one way in order to obtain their allowance and in a contrary way against infringers"); *Builders Concrete Inc. v. Bremerton Concrete Products*, 757 F.2d 255, 258 (Fed.Cir.1985); *Prodyne Enterprises v. Julie Pomerantz Inc.*, 743 F.2d 1581, 1583 (Fed.Cir.1984). As the court explained in *Builders Concrete*, "Material representations made to the PTO in response to references cited by the PTO, with the result that the scope of the patent claims is changed in order to obtain the patent grant, are pertinent to the subsequent determination of the permissible scope of the patent claims." *Id.* at 258. The doctrine of file wrapper estoppel thus limits the range of equivalents which may be said to infringe the patent claims.

In this case, the patent in suit was obtained only after the inventor limited his claims by requiring the presence of a grid spanning the enlarged open top of the dispensing container. He further limited his claim by providing a very specific definition of that grid. It thus appears to me that the inventor gave up the broad definition of "grid" that he now seeks to press on this Court in order to obtain allowance of claim 11. The range of equivalents allowed for claim 11 must, therefore, be limited to devices containing at least more than one "elongate bolt" or "first and second spaced elements" extending across the enlarged open top. The accused devices do not contain such elements. Defendant's present system features a funnel-shaped upper container that prevents the cattle from obtaining access to the feed because the funnel portion of the container extends into the open top of the dispensing container. His prior system contained a single bolt located at the extreme periphery of the dispenser top. Because the range of equivalents allowed for the claimed invention is narrow, I find that these devices do not infringe claim 11.

Plaintiffs' argument that this narrow claim construction renders claim 15 superfluous is unpersuasive. First, as defendant pointed out, claim 15 requires that the spaced elements extend across the top in different directions. A device with closely spaced parallel bolts or bolts arranged in a spoke pattern would infringe claim 11 but not claim 15. Second, the construction advocated by plaintiffs would completely eliminate the meaningful structural limitation placed on the claim by its use of the term "grid." *See Perkin Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1532 (Fed.Cir.1987) ("a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringements"). Finally, plaintiffs' argument ignores the well-settled rule that "claims are always interpretable in light of the specification that led to the patent.... Whether or not claims differ from each other, one cannot interpret a claim to be broader than what is contained in the specification and claims as filed."

*Tandon Corp.*, 831 F.2d at 1023–24. Here, the specifications and dependent claims provide a narrow, common sense definition of the term "grid." That definition may not be expanded beyond the scope accepted by the patent examiner in allowing claim 11, and under that definition, the accused devices do not appear to infringe claim 11.

I conclude therefore that plaintiffs have failed to establish a reasonable likelihood of success on their infringement claim. While Oakley's original product appears to literally infringe the '124 patent, that product is no longer offered for sale to the public. Present versions of the accused device do not contain the "grid" specified in claim 11, and the narrow range of equivalents to which that claim is entitled does not encompass these devices. Thus, I can see no likelihood that plaintiffs will succeed under an equivalence theory. Finally, as I noted above, the defendant has demonstrated a likelihood of success on his public use argument, thus casting the validity of the patent itself into question. For these reasons, I find that plaintiffs have failed to demonstrate the likelihood of success necessary to obtain preliminary injunctive relief.

### IRREPARABLE INJURY

■ Where validity and infringement have been clearly established, irreparable harm is presumed. *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1271 (Fed.Cir. 1985). Some courts have refused to find irreparable harm where the alleged infringer is solvent and damages will adequately compensate the injury. *See Nuclear–Chicago Corp. v. Nuclear Data Inc.*, 465 F.2d 428 (7th Cir.1972); *Rohm & Haas Co. v. Mobil Oil Co.*, 525 F.Supp. 1298, 1302 (D.Del.1981); *Jenn–Air Corp. v. Modern Maid Co.*, 499 F.Supp. 320, 333 (D.Del.) *aff'd* 659 F.2d 1068 (Fed.Cir.1981). This view has, however, been recently rejected by the Federal Circuit. *See Roper*, 757 F.2d at 1269 n. 2 ("[e]quity requires that no one element be dispositive, that each be weighed and measured against others and against the relief demanded"); *Smith International Inc. v. Hughes Tool Co.*, 718

F.2d 1573, 1577 (Fed.Cir.1983) ("The grant of a patent is the grant of the right to invoke the state's power in order to exclude others from utilizing the patentee's discovery without his consent"). Where an infringing device is no longer made, sold or used, injunctive relief has been held to be unwarranted. *Roper*, 757 F.2d at 1273 (where the patentee has shown no more than an "apprehension of potential future infringement ... such fears cannot justify the issuance of preliminary equitable relief").

In this case, the plaintiffs have demonstrated a likelihood of infringement with regard only to a product that is no longer available to the public. While plaintiffs may be entitled to damages for past sales of that device, they have not demonstrated that they will be irreparably harmed in the absence of an injunction. Similarly, while plaintiffs may eventually succeed on their infringement claim, their showing of infringement under the doctrine of equivalents and the questions regarding validity of the patent itself counsel against equitable relief.

## CONCLUSION

I conclude, therefore, that plaintiffs' motion for preliminary injunction must be denied. Plaintiffs have failed in their burden to establish a reasonable likelihood of success on the merits of their infringement claim, nor have they made a clear showing that their patent is valid. Defendant, on the other hand, has presented clear evidence indicating that the patent may indeed be invalid. Under these circumstances, equitable relief is not warranted.